Please rise. The Illinois Telephone, 3rd Division, is now in session. Honorable Justice James Fitzgerald Smith, presiding. Have a seat. Call the first case. Case number 16-1131, 231 W. Scott v. Greater Illinois Title Co. You want to step up and identify yourselves? Ardwin Boyer, on behalf of the appellant. I'm sorry, I didn't hear you. Ardwin Boyer, on behalf of the appellant. Nealon Goldberg, on behalf of the appellant. Good morning. Al Gorefeld Jr., on behalf of the appellee. Usual suspects all. Case for you now, the general, 15-15. If there's a lot of questioning, we'll give you some more time. And with that, you can rock and roll. May it please the court. The primary focus, we believe, of this appeal involves a trial court's ruling imposing the scope of a fiduciary duty that we believe is not properly supported by Illinois law, Illinois common law, by common law governing escrow agreements, by the escrow agreement that existed in this case. It's not supported by agency law. It's not supported by principles of equity. And the duty imposed here is not supported by public policy or marketplace issues. In order for us to get to that issue, and I agree that that's squarely at issue here, what lens do we look at it through? You're arguing that it's de novo. Your colleague over there is arguing that it's a manifest way of the evidence. Explain to us how we can look at a bench trial where a judge listens to competing evidence from expert witnesses, looks at the contract, listens to all the testimony of all the witnesses, looks at all of the inspection reports and the related documents thereto, and how can that not be anything but manifest way to the evidence? Duty, questions of duty, begin and end as questions of law. They are questions for the courts and only for the courts. Courts in Illinois decide what legal duties are, what the scope of those duties are, and to whom they extend and how they extend. That's the uniform principle of law. There is not a single case cited by the plaintiff in this case that says otherwise. Although they do question the review standard here, in close review of their case law, all of it involves questions of fact. They cite cases involving breaches. Isn't it fair to say that it could be a mixed question of law and fact? Not in this case. Then why not? I understand that that does exist in some cases. It's the first thing we look at. It's the standard of review, as you know. Exactly. And in this case, for one, the responsibility to the escrowee begins and ends, we believe, with the, in this case, begins and ends with the escrow agreement. And what was the title company to do under that very valuable $1,000 escrow agreement? Well, exactly. And as the defense says, it would be implausible to impose a duty on the trial court where they had to hire an inspector at $100 or $200 an hour at various times, at the whim of the plaintiff. They'd run through that $1,000 in no time. They had no expertise to do that. But getting back to the central question here on the scope of review, what they're really saying here is all a party needs to do is call a witness whose credentials may be questioned to say, I've had some experience and in some of my experience, some parties who are in this position here, an escrowee, some have done inspections on occasion. We don't know what the agreements were. We don't know what the responsibilities that were undertaken under the escrow agreement. But in any event, it has to take more than whimsical testimony of a party to create a duty. We run into these questions, for instance, even that in this case. I didn't see a really solid ---- Did you have a motion to bar the witness from giving any opinions related to the title company as opposed to the general contractor? Yes, but that still doesn't address the scope of review here. Yes, that's true. The standard of review, it doesn't answer that question in whether it belongs to the court or whether it belongs to some fact-finding responsibility. If this were a trial court, can we envision possibly ---- If this were a jury trial, can we envision possibly giving the jury as a fact-finder the duty question? Not in this case. It's just impossible that that would happen. But here, all they have is one witness, one gentleman who, Mr. James, who did home inspections, who made some mention, he even said there was no responsibility under the escrow agreement that he could see, no responsibility on the part of the escrowee to do inspections, and he just based that on some general experience. But getting back to ---- On the same topic, let's just segue into this. Assume for the sake of our oral argument this morning that we disagree with you on the standard of review and give us the best iteration you can of why the verdict here, the bench trial part of it, was against the manifest weight of the evidence. I think it's sort of related to much of what you've just been talking about. Okay. And I understand it to mean assuming there's a mixed question of fact. Right. Because there has to be some doubt involved. Right. We're still stuck. An escrowee's duty has to start with the agreement. The agreement is part of the evidence, and that agreement is not in dispute. And if we look to the elements of it, we have ---- and these were well highlighted and cited in the brief ---- but we have the purpose set forth. The purpose of the agreement was to provide dispersing services to the bank. That was the escrowee's responsibility, to provide dispersing services. What were the requirements for disbursement? GIT's duty was to provide policy coverage during these gap periods, the period or time between when the last escrow payment was made and the current escrow payment was made, and to ensure that title is clear to protect the bank's loan mortgage interest. The owner ---- and the agreement says this ---- the owner is the one who is responsible to supply these sworn statements, to supply the funding, to supply the approvals, to supply the waivers, the inspection reports. The lender's responsibility is to supply the money. There's a statement in the agreement in general. All, all of the escrowee's duties are set forth in the agreement. So we have a contract between the escrowee, between the plaintiff, in this case the owner, and between the bank, the lender, where they all agree that the escrow agreement in and of itself set forth all of the escrowee's duties. The disclaimers are significant because there are specific disclaimers in there that say there are sufficient funds in the escrow. The owner represents there are sufficient funds in the escrow to complete the project. So the escrowee is not responsible for funding or to make sure there's enough money, there's enough money to fix problems. The disclaimers say that the project will be completed. It's not the escrowee's responsibility to make sure that's done. There's a disclaimer that says the project will be completed per plans and specifications. That's not the escrowee's responsibility. And there's a disclaimer in there that Greater Illinois Title has no liability for errors and certifications. So what they're asking here, what the plaintiff here is asking is implausible in many respects. What they're saying is we as escrowee supplied and we provided the paperwork for Draw 7 and Draw 10, the significant paperwork for Draw 7 and 10. We included 7 because the trial court said that's when the alarm bells went off and when GIT should have acted according to the trial court. So we gave the paperwork there. And the plaintiff, in writing, signed the paperwork directing the bank to pay. And you say here at the library that what that means is that they're asking the title company be found liable even though it was Scott that falsely claimed that the work was done and everything was okay. And I use the word falsely carefully. I'm not claiming fraud here, but it just could be irresponsibility. But the information they're claiming was the escrowee's responsibility to look beyond the representations of the plaintiff in this case, to look beyond that and compare the representations and the paperwork. They're called sworn statements. They're certifications in directions to the title company that this work is complete and they direct the title company to pay. So the title company for its $1,000 gets a pot of money at various times with instructions to do payouts. If the math adds up, they are duty-bound to make the payout. In fact, the cases we cited clearly say that the title company, that the escrowee, can't take sides. They are not an arbiter. In fact, if Greger would have, in this case, withheld funds, if they would have said no, we're not dispersing, this is important. Form reasons other than questions about title. Because it is the escrowee's responsibility to... They don't want the title to be clouded by any liens. Exactly, so that the bank's interest remains a priority. There were no questions about title in this case. At least that's not what's being alleged here. Before we take up all your time, can you briefly talk to us about the sort of full-throated argument about waiver, that something that was brought up in summary judgment, and somehow this issue is waived. I do believe I treated that seriously and addressed it pointedly in the brief. It seems to me what they're saying... I read their case law and there was no... The judgment order was cited and the final order was cited in the notice of appeal. Yes. So I don't know in a bench trial where you go from there. Well, exactly, and the rule on it says we don't even have to bring a post-trial motion. And some of the case law on this says that at some point the appellant has to have brought the question up before the trial court to give the trial court a fair opportunity to consider it and address it. And certainly in all of the issues we're raising here, we did that. But what they're saying on the waiver issue, they say things like there's an affirmative responsibility to bring a summary judgment motion, a motion before trial on this. That's what it says. And that just... I would think that many trial judges would find that upsetting. I think they see enough summary judgment motions, and there is no principle of law that says a summary judgment motion must be brought in order to preserve an issue for appeal. So we faithfully presented all of the arguments we have here, particularly the duty argument, to the trial court. It was argued, I think, on a couple of occasions. It was argued during trial. It was argued post-trial. And the trial court did carefully consider those. We just disagreed with the result. I'd like to address a couple other things. The trial court placed a lot of weight on the Miller case. And the Miller case in particular had a general holding, which said that fiduciary duties are not based simply on contract law, that they're part and parcel of other areas of law, including equity and contract law. Well, that is certainly true. If we look to agency law, if we look to contract law, or we look to the law in equity, none of those cases, none of those bodies of law support extending the duty to construction loan escrowees to look beyond the documents applied to escrowees and to effectively oversee the construction work. They may object to us putting it this way, but that's really, from an escrowee standpoint, that's really what's being requested here. We're being asked to have a formal duty to question these documents. And the case law, I've cited cases here that says we can't pick sides and we can't do that. Even if the documents, we disagree with the documents or we disagree with those content, the escrowee must follow instructions. So where the owner is here, says, here's the documents, make the payout. The escrowee's responsibility is to make that payout. And we did that. We did that in every case. And also noteworthy, and I hope I brought this clear, is I included the paperwork in the appendix on Draw 10. So a year later, even a year after this Draw 7, the owner, this is Appendix 876 through 885. A year later, the architect's approval is in there. The owner's approval is in there. The lender's approval is in there. So one can really easily think, well, if there's an issue with Draw 7 in 2008, how can they possibly approve three draws later, a year later, and say everything is hunky-dory now, a year later? I mean, the fact is there were no objections to any of the draws. Grader was instructed to make the draws. Grader made the draws. Grader followed its legal responsibility in the contract. And we don't make this point lightly. There's an amicus brief on this, too, from the Title Insurance Association in Illinois. For title companies in their escrow roles that they serve to undertake responsibilities to start overseeing construction projects, which they're not equipped to do. They don't have the staff to do it. They don't have construction experience. It is truly a burden in an undertaking. They're ill-equipped to do. They don't undertake to do them. There's nothing in the language of the contract. There's nothing in the law that requires this. In fact, as I've pointed out, to do that, to look beyond these documents would expose them to liability because they're supposed to play it even. They can't take sides. They can't say, no, we're not going to make a draw because we think this would be unfair to the owner. This would be unfair to the bank. Once we put escrow leads in that position, where today their responsibility is to look after those funds. Would you give us a little bit on the proximate cause argument? Briefly, I really thought of Hadley versus Baxendale, an old contract law back in the law school days, and there's another Swiss bank case that came up in the 70s or 80s that I think fits within this. But what we have here is let's assume that escrow leads are responsible for doing what the trial court said. They have to make an inquiry. An objective escrow lead would have no idea what that means or what needs to be done to satisfy that duty. Call the owner, for instance. Say you're supposed to call the owner. Something's not right. Well, the owner is the one who supplies the certifications. So the escrow lead acts on the representations of the owner. So are we saying now that escrow leads are obligated to tell the people who are making promises to them, we don't think your promises is accurate? And in fact, the principle of equity involved here is it's a couple. Equity follows the law, and there's another one that says equity requires no idle gesture. Another one is one who seeks equity must do equity, and one would think that under that last principle, doing equity would be to give accurate information to your agent in whom you're placing trust to make these disbursements. So we argued in the briefs that there was no cause in fact. Let's say, for instance, the escrow lead does call the owner and say we think there's something not up with the paperwork. What then is the logical nexus between that inquiry on the one hand and on the other hand, remedying this failing construction project? Where is the connection there? Telling the owner you need to do a better job overseeing the project? I mean, all of that falls back to the owner. And then the other question is legal cause, which is foreseeability, and the question there is if a reasonable, and I'm using an objective standard, if a reasonably objective construction loan escrow lead were to look at that escrow agreement and say, well, if I have to look beyond this and make a call or an inquiry or a viewing, as they called it, what could I possibly do? Or what risk would I possibly be undertaking there? And no reasonable construction loan escrow lead would foresee that they are being held responsible for the construction work. And the plaintiff is really asking for that. That's the question of law. That's where questions of law come in. How far will courts go in imposing duties and the scope of the duty of a construction loan escrow lead, and only courts can answer that. Thank you. Good morning, and may it please the Court. First on standard of review, there is no pure question of law here for de novo review for six very short reasons. First, the trial court didn't make any ruling purely as a matter of law, except perhaps to agree with GIT that there's no fiduciary duty to conduct a professional inspection in connection with an escrow. The court, following a bench trial, applied existing common law, i.e., Toro and Harris, to the evidence it heard. And the standard of review for a trial court's ruling in a bench trial is always manifest weight of the evidence. Second, there's no dispute below or an appeal on the key legal issue here, namely the premise that GIT, as escrow lead, had a fiduciary duty to plaintiff that was not based solely in contract. GIT admits that this is the holding of Harris at page 24 of its opening brief and page 8 of its reply. So there is no big legal issue here for de novo review. There's no disagreement on that fundamental fiduciary duty. Third, scope of fiduciary duty. Whether the scope of fiduciary duty, of GIT's fiduciary duty, includes a duty to professionally inspect the work, determine the percentage completed, look at the quality of labor materials, et cetera, is not before this court. Because the trial court held there's no such duty. Fourth, the scope of duty here was made as a factual determination by the trial court. It determined the scope of that duty by recourse to the facts and the evidence at trial in particular. Based on the five red flags, five types of red flags, that are contained within GIT's own draw files, the discretion that GIT possessed in the escrow agreement that it drafted to verify the contractor's statements and halt disbursements, and based on what GIT's own expert said GIT should have done in these circumstances, after hearing all of that evidence, the court ruled that GIT's duty included making a few phone calls, possibly some additional investigation if warranted, and possibly an informal look at the project, only if absolutely necessary. So since the trial court's determination of the scope of GIT's duty in the circumstances was based on the evidence, the court's ruling gets manifest weight review here. All right, let's assume that it's either manifest weight or clearly erroneous if it's a mixed question of law and fact. How can you persuade this court that this escrow agent is supposed to make phone calls, second-guess what the owners tell them, second-guess what the architects tell them,  how does that fall into the duty of a title company acting as escrow weed, dishing out the dough according to what instructions they're given? That's the problem that I think we're dealing with here today. Forget about the standard of review. Okay. A couple of points, Justice Levin. First, Harris and Toro— I won't call you a half-walled if you don't call me— I'm sorry. —ladder. Ladder. I apologize. It's my eyesight. I'm sorry. I get it all the time. I'm just teasing you. Okay, thanks. The—Toro and Harris hold that as a matter of law, there is a fiduciary relationship that exists between an escrow weed and a depositor. And they hold that that baseline duty is separate and distinct from the terms in the contract that may exist between the escrow weed and the depositor. So, in other words, the duty of GITC here was not strictly limited to the contractual terms. Under GIT's escrow agreement, GIT had the legal authority and the discretion to verify the accuracy of the contractor's sworn statements. And it had the legal authority and discretion to halt disbursements on the project if it found inaccuracies in those statements. And the inaccuracies here would be those of your client and the architect? Who's making the inaccurate statements here? The general contractor. The general contractor is making the inaccurate statements. And that was Jerry Lewis? That was JLL Construction Services Inc. owned by Jerry Lewis. And the contractor's statements are what are critical. And they're what GIT's own expert focused on. When GIT's expert testified about what the word verify in the escrow agreement means, he talked about verifying the reasonableness and the accuracy of statements made by the general contractor. Because it is the general contractor that GIT listens to when it comes to determining whether or not to pay out on a given draw. Excuse me. Don't they also look at the owner's documents and the architect inspector's documents? Justice Paczynski, that is what the escrow agreement requires. Right. In this case, GITC did not follow the requirements in the escrow agreement that it have all those signatures. There are two draws where the plaintiff's signature is completely missing from the draw files. And in 50%, five out of the ten draws, the architect's certification is missing from GIT's files. This all came out in evidence before the trial court. The tenth draw, though, the owner did sign the tenth draw. And that included one through nine. Is that correct? That is an opinion that was expressed by Mr. Peterson, GIT's expert in the case. That is the source that they rely on for that particular argument. However, GIT had knowledge that the plaintiff, in this case, did not have its own architect. The plaintiff did not have its own inspector. But the bank did. The bank did. The bank did and How many do we need? Well, if you just had one where GIT actually made sure that the architect's certifications were in the file, then this might have turned out okay. Let me ask this. I don't know if it came out in the briefs and I didn't see it in the record, but Jerry Lewis Construction, you know, is that a valid entity, functioning, coverage, et cetera? Or is it the title company or the DPAC? Well, JLL was supposed to provide a bond for the project. This is testimony that came out at the trial. But it turns out it did not. So it was not bonded. So I suppose you could say that GIT is the deep pocket here. But, I mean, looking strictly at the law. Well, let's look at the law. Tell us why Fantino is something that should not be controlling on the central issue in this appeal. Distinguish Fantino and Miller for us. Well, I can tell you that Fantino, I'm having trouble recalling. All right, Fantino is a 1999 case in which the court faced a similar circumstance and declined to expand the escrowees' duties beyond what was required by the agreement. That seems to be what your entire theory of the case is then. So that's what Fantino is. Well, Justice Levin, I think it's very important that the court understand that if GIT's fiduciary duty to the plaintiff here was strictly limited to the letter of what the escrow agreement mandated that it do, then it is meaningless to talk about a title company's separate fiduciary duty to an owner. The whole point of Harris and Toro and the other case, Stark, from 1940 to 1941, is that the element of fiduciary duty at common law that is owed by the escrowee to the depositor is distinct from the contractual terms that may exist between them. So the element of fiduciary duty has to add something to the legal equation here. Otherwise, in those cases, that law doesn't make sense. So if GIT's fiduciary duty encompasses what GIT was allowed to do under the escrow agreement, namely to verify and to halt disbursements, then this court can make sense out of the title company's common law fiduciary duty to the owner, and the trial court was correct in doing so. But if there's a pure equivalency between fiduciary duty and the strict contractual terms, then fiduciary duty is meaningless. This case is very much like the Toro Petroleum v. Newell case decided by the First District years ago. In Toro, the title company claimed that its sole duty under the escrow agreement was contractual, just as GIT claims here. The court there rejected that argument for a breach of fiduciary duty analysis instead. In Toro, the title company argued, excuse me, plaintiff argued that the title company had warning of the impropriety in connection with the escrow by many facts. It's the same thing here, where there were at least five different types of red flags over a long period of time, and GIT's own expert agreed that given the extended delay, GIT should have picked up the phone and made some phone calls and found out what's going on. In Toro, the escrow lead breached its fiduciary duty by dispersing without following the escrow instructions to the letter. Similarly, GIT here tries to ignore all the missing signatures in its own files in this case. In Toro, the escrow lead appealed a bench verdict just this year against it for breach of fiduciary duty to the depositor, despite the missing signatures. And in Toro, like here, the real issue was fraud. Fraud by the party seeking to draw out funds from the escrow. And the only difference with Toro, or a major difference, I think, is that in Toro, it was a question of the escrow lead not following a mandatory instruction in the escrow agreement. Here, it is a question of the escrow lead not using a discretionary provision in the escrow agreement to protect the plaintiff's interest, which But how, you know, you keep bumping right over the fact that they've got these certificates from the parties. And then once you get those certificates, where do you go from there? The foreseeability of your argument goes out the window. I mean, you're like, you're almost like making up a third argument that doesn't exist. I don't see that you get over foreseeability of a duty at all in this case. Well, Justice Smith, I think that foreseeability was very simple and straightforward. Once you got a certificate, I say I go home. Well, when you have a project that's stretched on for nearly When I'm only receiving $1,000, how far out am I going to go to inspect? I mean, if I got $20,000, I'd say there might be some merit to your argument about a little more than a phone call. With $12,000, I mean, a title company doesn't do these things. You're creating imaginary facts. Well, I'll respond to it. I'll try to respond as I can to a number of the points that you made. First, the toil case addressed this exact point and rejected the point that And it held the title company liable for the entire loss amount. Second, we're only talking about the trial court is only talking about problem projects. And it doesn't cost much in terms of time or anything in terms of money to pick up the telephone and make a few phone calls to ask questions and try to find out The agreement specifically says that G.I.T. does not assume any liability for loss caused by errors and certifications provided by others as to work in place. And, Justice Levin, that point was never raised below. It was not the subject of an affirmative defense. It's the only reason you have a relationship with this defendant. The only reason they're in there is because of this agreement. And now you're going to say that it wasn't raised? No, they didn't raise that below. As an affirmative defense or as affirmative matter in a motion to dismiss, it was never raised, period. That agreement was never entered in evidence? The effect that that provision may have had was never raised. No, period. Anybody who is sitting in judgment on this case looks at the language of this agreement, and this agreement says they have the right to verify. It doesn't say they have the duty to inspect. It doesn't say they have the duty to countermand inspections, the duty to not believe what the owner is telling them has been done. I mean, you're trying to create a whole new agreement here that's completely contrary to what the actual agreement says. And whether it's manifest way to the evidence or abusive, whatever the standard is, clearly erroneous. I just don't see how you – the only way you can do it is to do what you're trying to do, which is to create a new agreement. There's no new agreement. It's simply – Sure sounds like it. The element of fiduciary duty must mean something. If the only thing the JIT was obligated to do was to follow the technical letter of the contract, then fiduciary duty is meaningless. It's meaningless to say that in common law in Illinois, there's a fiduciary duty from a title company escrowee to an owner. And all the trial court did was look at the escrow agreement and consider the fiduciary duty and say, yeah, you should have made a few phone calls. No, you don't have to do a professional inspection. No, you don't have to incur a lot of costs or develop a new expertise. And the phone call is going to result in the architect saying, well, my bad. Actually, the work is really pretty shoddy. Or the owner saying, yeah, I shouldn't have signed that because these guys are – this place is going to be a wreck when it's done. Is that how you get your causation in? No, I think the causation comes in if JITC had made a few phone calls and – And what happens? Ray, I'm trying to tell you. Then it would have discovered that the payouts, the draw requests and the payouts to the contractor were way ahead of the actual work done on the site. And then the owner could have found out about it. And had the owner found out about it, it could have either addressed – JIT would have halted disbursements to the contractor. The contractor would have had to catch up on the work. Or the plaintiff could have had the opportunity to fire the contractor and hire a new one to finish the project. Okay. So JITC calls the contractor and the contractor says, well, really, the lintels aren't in and the flooring is – subflooring is not in yet. We already got paid for that. So we made a mistake. The contractor is going to tell JITC that? Really? No. Here's what I'm saying. Not necessarily the contractor. I don't think there's any question that the architect – the bank's architect inspector signed ten times. Five times. I'm trying to tell you. Their files are missing – in the record, their files are missing signed certifications to the architect. They removed the buyouts of Lakeside and MIG, and both of those entities possessed all ten signed approvals from the inspecting architect. You're telling me that is not accurate? I am telling you that is not accurate at all. What we proved in the trial court is that with the escrow – with their original file in the courtroom and the escrow clerk there who disposed on this account, five of the ten architect approvals are completely missing from JITC's files. And from two of the draw bags, the plaintiff's signature is completely missing. No way. He signed one through eight. There's no doubt about that. The plaintiff? Yeah, the owner. And honestly, I'm trying to remember which two it's missing from, but it's missing from two. Okay. He signed – our review of the file showed he signed one through eight. Ten was filed in file nine. So he signed one through eight plus number ten, but number ten on the face of it shows one through ten. So that to me shows that the owner signed with ten approvals. Okay. Well, again, this is a system that was set up by JIT. This is the contract they drafted. The owner had never developed a project before. This was the first time. Okay, okay. And did not have its own architect. That's why the bank doesn't inspect the architect. Excuse me? The owners don't know what they're doing. Right, but that architect was for the bank and not for the owner. Once the inspecting architect signs off, then the owner signs off one through eight plus number ten, which lists one through ten. I don't know what else the ESCO agent had to do here. I would also say that this whole issue of, I mean, I don't know what to call it. It's a concept of comparative fault where the real party, that the plaintiff did it to himself. I think that's what JIT is arguing to this court. Well, I don't think it has been articulated in that fashion. The people who have responsibilities to inspect and to report arguably didn't do that good of a job, but the jury found in favor of, who did they find in favor of? The MGE architect. MGE architect, yeah. Okay. I'm sorry. I missed the question. My point is the jury was told that there were problems with the architect's inspections, right, and the jury found in favor of the architect. And now you're trying to hang on to what you can from the verdict because Jerry Lewis never posted his bond, and you're trying to get it from a person who has a contractual duty to do nothing that you're suggesting he has the duty to do. That's the way it seems to me. Okay. I haven't thought it through in exactly that manner. I'm trying to argue that the trial court correctly applied existing common law to the evidence that it heard. And unforeseeability, I think it's very simple. It was completely foreseeable that if you disperse for work not done, then the owner is harmed. After I, the owner, sign off on it. That's like driving a train in reverse. But if GIT doesn't get the architect's certifications that the escrow agreement says it's supposed to have. Once you've got one of the owner's certifications, you're out of the ballgame. And I don't think that GIT has cited any authority for its point that somehow the unsophisticated owner who signs the tenth draw suddenly has said okay to GIT not doing its due diligence. It's unsophisticated. Come on. They form an LLC. They get a loan. They've got an architect. They've got a general contractor. You know, there's some level of sophistication here. If I may. I don't know how much longer you planned. I think you see where we're going. And I think you may as well close the barn. Okay. I'd be happy to close the barn. I'm sorry. You can do as much as you can, but it sounds like you had a client that wasn't the sharpest. In conclusion, I would say that. I'm sorry. That's okay. Is that a motion to withdraw that amendment? Okay. The trial court did not expand the escrow's fiduciary duty to include inspections. The court's liability ruling, which applied existing common law to the evidence it heard, was narrow, and it said it applies to this case only. All agree, even GITs in their briefs agree, that fiduciary duty, its fiduciary duty, is broader than the contractual terms. And yet the court didn't even hold GIT liable for doing anything that GIT didn't already have the right and the discretion to do in the escrow agreement. It's not like the court made up stuff. Its own expert, GITs, said verifying means, yeah, you call the contractor, you look at the contractor's form statements, you figure out what happened, if there have been delays of many months. So GIT's own expert said GIT should have known there were problems and should have made telephonic inquiries, but he also said GIT had too many files. Thank you. Thank you. Thank you. Now do we make this equal by beating on you? We can start out how you cited a case called Wright v. Puchinski. Page 3 of your reply brief, in this panel we call that wrong versus Puchinski. I tread cautiously here. Okay. We go for levity. Levity of brevity. You guys have held us loose. We're used to being restrained up here. Okay. There's just a couple points I would like to make here. One, where the counsel claimed we did not address arguments below. In the reply brief at pages 3 and 4, I meticulously summarized the trial memorandum that was submitted before trial, the closing arguments, our post-trial motion to reconsider, vacate, and modify, and cited by page number each and every instance where we cited, where we argued, where we presented the fiduciary duty argument and the damages argument, including all the contractual arguments that were made. They were laid out specifically in the briefs for the trial court to consider. So we disagree with counsel's contention that we did not raise those below. And I have shown the appellate court by page where we did. One more thing that hasn't been mentioned about the duty to inspect. In page A68 through A71 of the appendix, we included the owner's, the plaintiff's contract with the contractor. And at the second page of that document, they hired JLL, Jerry Lewis, to, and I'll read this, provide management, control, administration, planning, scheduling, and coordination of the overall activities, maintaining control of construction progress of each subcontractor to ensure completion of the work on schedule and in accordance with plans and specifications. And right below that is provide supervision and organization of all construction support activities at the job site, including reports referenced in the operation manual. And there's more there. So the point is there was a contract for someone to perform the supervisory activities that they're trained to move over, shift over to the SOE, and it was JLL. They hired JLL to do all these things. Third point very briefly, the plaintiff did have an attorney in this case, and they were advised and why there was no bond or why the bond wasn't finalized or why they didn't hire their own inspector to look after their interest. We don't know why they made those decisions in the course of the attorney-client relationship, but they didn't. And they certainly had the opportunity to do so. Last, counsel cites TORL. We disagree with Mr. Holfeld's description of the TORL case. The TORL case in fact held what we're saying is to be the law here. The TORL case held that an escrowee's duty is to follow the escrow instructions. In TORL, the escrow agreement required the signature of both parties, the principal and the depositor. Only one signed the direction to disperse. That's the problem the appellate court in that case had because the instructions said both signatures are required to make a disbursement, and the escrowee, the agent, dispersed with only one signature. So the damages imposed in that case were they required the escrowee to refund the $20,000 that had been improperly dispersed. The point there, the escrowee's responsibility is to follow instructions, and where they don't, the limit of their damage is to replace the money. So TORL says we cite TORL as part of our authority, and it supports what we're saying. And lastly, I would ask the court not to overlook the FELOSA case also, which says very strongly that the employee must follow the terms of the agreement. It must disperse if the conditions are met. The escrowee cannot judge conditions. The escrowee cannot challenge terms. If the conditions of the escrow are met, the escrowee must deliver the proceeds. They must. And again, turning back to Draw 7 and 9 in the appendix, you'll see from these that we start with the cover of the jacket. There was a jacket for each draw, and there's a cover, and there's stamps on the front covers of each of the ten draws where they have lender's, architect's approval date, that's stamped on there. The owner's approval date, that's stamped on there. The owner's sworn statement, that's stamped on there. So each of these covers for all ten draws, the covers show that the documents were there for all ten draws. And in particular for Draw 10, we have the owner's sworn statement. We have the certificate of completion from the architect, the certificate of completion from the lender, the certificate of completion by the owners, and the direction to disperse. And I pulled these from a lengthy record because in February of 2009, the owners took the position that everything was in order. Thank you. Thank you both sides. We didn't mean to give you a hard time, but sometimes the briefs don't tell the whole story, and you want to try and get as much out from both sides as you can. But thank you very much. We appreciate you've both represented your clients well. Thank you. Very well done. Thank you. Thank you, Mr. Advisor. Thank you, Mr. Advisor.